*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-1259**

State of Minnesota,
Respondent,

vs.

Terence Duane Maurstad,
Appellant.

**Filed July 6, 2026**
**Affirmed in part, reversed in part, and remanded**
**Reyes, Judge**

Mille Lacs County District Court
File No. 48-CR-24-1004

Keith Ellison, Attorney General, Tara Reese Duginske, Assistant Attorney General, St. Paul, Minnesota; and

Corey Haller, Mille Lacs County Attorney, Milaca, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Reyes, Judge; and Bratvold, Judge.

**NONPRECEDENTIAL OPINION**

**REYES**, Judge

In this direct appeal, appellant challenges the district court's (1) admission of testimony under Minnesota Rule of Evidence 613(b); (2) admission of expert testimony regarding domestic violence; (3) entry of judgment of conviction and sentencing on two

counts of assault against one victim; and (4) allocation of jail credit to the last sentence imposed. Appellant raises additional arguments in a self-represented supplemental brief. We reverse the fifth-degree-assault conviction and remand with instructions to vacate that conviction and sentence and to apply the jail credit to the first sentence imposed. We otherwise affirm.

## FACTS

Respondent State of Minnesota charged appellant Terence Duane Maurstad with four counts of second-degree assault with a dangerous weapon in violation of Minnesota Statutes section 609.222, subdivision 1 (2022) (counts I-IV); one amended count of fifth-degree assault in violation of Minnesota Statutes section 609.224, subdivision 2(b) (Supp. 2023) (count V); and one count of felony domestic assault in violation of Minnesota Statutes section 609.2242, subdivision 4 (2022) (count VI).

The following facts are based on evidence received at trial, including the testimony of an expert witness, an officer that responded to the incident, and assault victims A., L., and D.

A. and L. testified to substantially similar versions of the incident from which appellant's criminal charges arose, which we restate here. One evening, A. and L. were at the home of L.'s cousin when D. walked in, limping and crying with red marks on her body. A. walked outside and saw the driver of a truck "revving the exhaust loud," "yelling," and "throwing [D.'s] stuff out of the windows." At that time, A. and L. did not know the identity of the driver or his relationship to D.

A. and L. left the cousin's home sometime later. A little after midnight, L. was driving the two of them in her car when they saw someone walking alongside the highway. A truck drove behind the pedestrian, and the driver "exchang[ed] words" with the pedestrian. A. and L. thought they saw the truck "bump[]" or hit the pedestrian. A. recognized the pedestrian as D.

L. turned her car around and told D. to get in. "[D.] ran, jumped in the car, and then at that point the loud truck started to ride [L.'s car] so close if [L.] hit the brakes it would have been into the back of [her car]." A. observed that L. and D. had anxious and frantic demeanors. D. was also "hyperventilating."

L. drove to a police station. On the way, she tried to make a turn but because the truck was following her so closely, she "couldn't slow down enough" and drove halfway into a ditch. The truck pulled over behind L.'s car. A. got out of the car and saw that appellant was the driver of the truck. A. saw appellant "start[] reaching for something" in his truck "[s]o in fear for [his] life [A.] turned around and got in the car and told [L.] to take off." They resumed their drive to the station, and appellant continued to follow them.

Appellant stopped following them shortly before they pulled into the station's parking lot, where L. called law enforcement. D. was crying in the backseat, but she ultimately exited the car and walked away before law enforcement arrived.

After A. and L. testified, the state called D. to testify. D. stated that she and appellant "g[o]t intimate" and had a sexual relationship, "but [they] were never in a committed relationship." D. did "[n]ot really" want to be there that day because she did not "feel [appellant] did anything wrong." D. provided a version of events that differed

3

substantially from those provided by the other two victims, A. and L. D. testified that, when she had arrived at the home of L.'s cousin in appellant's truck, appellant said something that irritated her. D. testified that she tried to get out of the truck but "[appellant] didn't want me to walk away from him, so—without saying something, which is, you know, it was disrespectful for me to just do that. I need to learn not to do that." D. stayed at the house for a few hours but eventually left on foot. While walking alongside the highway with her headphones on and loud music playing, appellant pulled up alongside her. Appellant tried to talk to her, but D. "wasn't hearing him because [of her] ear buds, so [she] was basically ignoring him." D. then "heard this female's voice holler, 'hey,'" and she saw L., who told D. to get into her car. D. described her response to L. as follows:

> I'm like, "What? Why?" You know, so I just—I did [get in the car] and we went straight to the [station]. I'm, like, "What's going on? What are we doing?" She's like, "Well, he tried to hit you." And I was, like, "Who?" Really. And he was, as far as I know, was just riding alongside me, trying to talk to me, and I was being a b-tch and ignoring him.

When asked about what occurred while she was in L.'s car, D. testified that she had her headphones on and was not paying attention.

When the state asked D. about a statement she gave to an officer later that evening, D. testified that she remembered giving the statement but did not remember what she told the officer. She also testified that, in her past experiences related to "abusive partners," D. "found that law enforcement has been more harmful for [her] than helpful," so she preferred "not [to] talk to them."

4

After the conclusion of D.'s testimony, the state presented testimony from an officer that responded to L.'s call. The officer explained that he arrived at the station and took statements from A. and L. there. A. told the officer that he had observed what looked like appellant "trying to hit [D.]" and D. "yelling for [appellant] to stop and leave her alone." A. also told the officer that he and L. picked up D., after which appellant began "following extremely close to their vehicle." The officer testified that A. and L.'s statements were consistent with each other.

The officer located D. at a casino later in his shift. D. told him that she left the station before officers arrived because she was scared to talk to law enforcement as doing so "has hurt her in the past." D. also told the officer that appellant drove closely behind her while she was walking, was trying to intimidate her, and attempted to hit her with his truck multiple times. D. stated that, after she got in L.'s car, appellant "was attempting to rear-end" the car and "trying to intimidate them."

The officer also testified about a lethality assessment that he performed with D. The assessment consists of a list of questions that law enforcement asks victims of domestic assault. D. told the officer that appellant had used a weapon or object to threaten her before, he tried to control most of her daily activities, she "[a]bsolutely" believed that appellant was capable of killing her, appellant's behavior had escalated quickly over the past two weeks, and she had ended their relationship within the last six months. D. stated multiple times that she feared appellant.

The state's last witness, Melissa Scaia, testified "as an expert in counterintuitive behaviors in domestic violence victims." Scaia works with victims of domestic violence of all ages and genders as well as men who have committed acts of domestic violence.

Scaia testified generally about "the combination of physical and non-physical tactics used" by people who commit acts of domestic violence as well as the motivations underlying those tactics.[1] Individuals will use "coercion and threats" to "attempt to dominate" victims and "get them to do" what the individual wants. For example, individuals may tell a victim who wants to call law enforcement, "Why would anyone believe you, but you go ahead and you'll see what will happen to you."

Scaia further testified that victims who call law enforcement themselves may be more likely to cooperate than those who do not initiate that contact. A victim may also become less cooperative if they realize that that their "continued participation" in a case may result in an end to the relationship because, while "a lot of victims want the violence to end, . . . they don't want the relationship to end." Scaia also shared that victims often recant, blame themselves, and minimize or deny incidents of harm.

The jury found appellant guilty on all counts charged. The district court entered convictions on counts II through V only. It imposed consecutive sentences totaling 180 months in prison on counts II, III, and IV. It also imposed a 364-day sentence on count V, with 364 days of credit for time served.

---

[1] Scaia referred to a "Power and Control Wheel" throughout her testimony, which she described as "a visual graphic of the most common behaviors that victims have experienced." The district court admitted a depiction of the Power and Control Wheel into evidence.

This appeal follows.

**DECISION**

Appellant challenges the district court's (1) admission of the officer's testimony about D.'s prior statements; (2) admission of Scaia's expert testimony; (3) conviction and sentencing on two counts of assault against A.; and (4) award of jail credit to the last sentence imposed. We discuss these issues in turn, then address separately arguments raised in a self-represented supplemental brief.

## I. The district court plainly erred by admitting the officer's testimony about D.'s prior statements, but this error did not affect appellant's substantial rights.

Appellant argues that the district court plainly erred by admitting the officer's testimony about D.'s prior statements under Minnesota Rule of Evidence 613(b). While we agree, we conclude that the plain-error standard does not mandate reversal in this case because appellant's substantial rights were not affected.

As an initial matter, appellant contends that he objected at trial to the admission of the officer's testimony about D.'s prior statements. For support, he relies on an objection he made to the admission of body-worn-camera footage of witness statements. However, "an objection preserves review only for the stated basis for the objection or a basis apparent from the context of the objection." *State v. Martens*, 18 N.W.3d 752, 757 (Minn. 2025) (quotation omitted). Here, the record shows no objection from appellant to the admission of the officer's trial testimony about D.'s prior statements.

Because appellant failed to preserve the issue with an appropriate objection, this court reviews the evidentiary challenge under the plain-error standard. *See id.* Under that

standard, the appellant must first establish an error that is plain. *Id.* "An error is plain if it is clear or obvious, which is typically established if the error contravenes case law, a rule, or a standard of conduct." *State v. Webster*, 894 N.W.2d 782, 787 (Minn. 2017) (quotations omitted). The appellant then bears the "heavy burden" of showing that the plain error affected their substantial rights. *State v. Brown*, 815 N.W.2d 609, 620 (Minn. 2012) (quotation omitted). If the appellant successfully carries that burden, appellate courts "may correct the error *only* when it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Martens*, 18 N.W.3d at 757 (quotation omitted). But if an appellate court "conclude[s] that any prong of the plain error analysis is not satisfied, [it] need not consider the other prongs." *Brown*, 815 N.W.2d at 620.

A party may introduce "extrinsic evidence of a prior inconsistent statement" to impeach a declarant-witness if (1) the party "submit[s] a foundation that the statements are actually inconsistent, or that the [declarant-witness] fails to recollect the prior statement," *State v. Martin*, 614 N.W.2d 214, 224 (Minn. 2000) (quotations and citation omitted), and (2) "the [declarant-witness] is afforded a prior opportunity to explain or deny the [statement] and the opposite party is afforded an opportunity to interrogate the [declarant-witness] thereon," Minn. R. Evid. 613(b). "If the prior statement is embodied in a writing, the [declarant-witness] should be allowed to examine it." *Price v. Grieger*, 70 N.W.2d 421, 425 (Minn. 1955). Extrinsic evidence admissible under rule 613(b) may include another witness's testimony about the prior inconsistent statements. *See, e.g.*, *Martin*, 614 N.W.2d at 224-25.

8

During direct examination, the state asked D. if she recalled talking to the officer and pointed out to her the inconsistencies between her testimony and her prior statements to the officer. However, the state did not attempt to elicit an admission, denial, or explanation from D. concerning those inconsistencies. The admission of the officer's testimony about D.'s prior statements was therefore plainly erroneous. *See, e.g.*, *State v. Graham*, 764 N.W.2d 340, 354 (Minn. 2009) (holding inadmissible officer's written summary of interview with witness because, although witness "was asked whether he recalled" it, witness had no "opportunity to admit, deny, or explain specific statements" in summary); *Webster*, 894 N.W.2d at 787 (providing that error is plain if it "contravenes case law, a rule, or a standard of conduct").

The state also failed to lay a proper foundation to admit the officer's testimony about D.'s answers to the lethality assessment. The state did not mention D.'s responses to the assessment during direct examination, so those responses could not be inconsistent with D.'s trial testimony, and D. could not claim that she did not recall giving them. *See Martin*, 614 N.W.2d at 224 (requiring actual inconsistency between statements or failure to recall prior statement to admit rule 613(b) evidence). The admission of the officer's testimony about D.'s answers to the lethality assessment contravened caselaw and was therefore plainly erroneous. *See Webster*, 894 N.W.2d at 787.

We next consider whether appellant carried the "heavy burden" of showing that the plain error affected his substantial rights. *Brown*, 815 N.W.2d at 620 (quotation omitted). "An error affects substantial rights if the error is prejudicial—that is, if there is a reasonable

9

likelihood that the error substantially affected the verdict." *State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002).

Two factors favor the conclusion that the plain error affected appellant's substantial rights. Appellant could not effectively counter the erroneously admitted testimony about D.'s prior statements because the state introduced that testimony after D. was dismissed. *See State v. Bigbear*, 10 N.W.3d 48, 59 (Minn. 2024) (concluding that defendant "did not effectively counter the inadmissible evidence" and this favored conclusion that error was not harmless); *see also State v. Matthews*, 800 N.W.2d 629, 634 (Minn. 2011) (stating that substantial-rights analysis "is the equivalent of a harmless error analysis"). The testimony also had high persuasive value because it directly contradicted the only exculpatory evidence identified by the parties: D.'s testimony. *See Bigbear*, 10 N.W.3d at 57-59 (concluding that high persuasive value of erroneously admitted evidence favored defendant).

However, two other factors weigh against appellant. The state presented eyewitness testimony from two other victims of the assaults, and those victims testified to substantially similar versions of events. *See id.* at 60 ("Strong evidence of guilt undermines the persuasive value of wrongly admitted evidence." (quotation omitted)). The erroneously admitted evidence was also not given undue prominence at trial. *See id.* at 56 (stating that manner presented favored state when challenged statements "span[ned] about 12 pages of" 300-page trial transcript).

Weighing the factors favoring appellant against those favoring the state, we conclude that the erroneously admitted evidence did not affect appellant's substantial

rights.  We therefore do not assess the last prong of the modified plain-error standard.  *See*

*Brown*, 815 N.W.2d at 620.

**II.     Even if the district court abused its discretion by admitting the expert testimony, there is no reasonable possibility that its admission significantly affected the verdict.**

Appellant challenges the admission of Scaia's testimony, arguing that it was not

helpful to the jury and it "invited the jury to infer that, because [appellant's] conduct fit the

profile of a male domestic abuser, then [appellant] must be a domestic abuser."  We are

not convinced that appellate relief is warranted.

Appellate courts review preserved challenges to a district court's evidentiary

determination for an abuse of discretion.  *See State v. Heller*, 12 N.W.3d 452, 464 (Minn.

2024).  "Admitting expert testimony is an abuse of discretion if the district court's decision

to admit is based on an erroneous view of the law or is against logic and the facts in the

record."  *Id.* at 466 (quotation omitted).  However, an appellant must establish both an

abuse of discretion and prejudice.  *State v. Bonnell*, 31 N.W.3d 527, 549 (Minn. 2026).

"To demonstrate prejudice, a defendant must show that there is a reasonable possibility

that the wrongfully admitted evidence significantly affected the verdict."  *Id.* (quotation

omitted).

To be admissible, expert testimony must be helpful to the jury.  Minn. R. Evid. 702.

For example, in *State v. Fravel*, the supreme court affirmed a district court finding that

expert testimony about counterintuitive behaviors of victims of domestic violence would

"assist the jury in its determinations as to," among other things, "the trustworthiness of [a

victim's] statements related to past instances of domestic abuse."  34 N.W.3d 309, 325

(Minn. 2026) (quotation omitted). However, evidence offered to show that "a defendant fits a certain profile" is inadmissible because "the unfair prejudice to the defendant" caused by its admission "outweighs the probative value of the evidence." *Heller*, 12 N.W.3d at 466.

We need not assess the helpfulness of Scaia's testimony because there is no reasonable possibility that its admission significantly affected the verdict. *See Bonnell*, 31 N.W.3d at 549. The jury heard limited evidence about appellant's conduct toward D., which included only what occurred the evening of the assault, that D. and appellant had a sexual relationship, and D.'s positive feelings toward appellant. No substantive evidence placed appellant within the parameters of a "profile" of people who commit domestic assault. *Heller*, 12 N.W.3d at 466. For that reason, the jury was not "asked to infer from the fact that the defendant shares some of the characteristics of these third persons that he shares their guilt of [domestic assault]." *Id.* at 466-67 (quotations omitted).

We also need not assess whether Scaia's testimony about offender behavior was "akin to character evidence." The supreme court in *Fravel* was presented with a similar argument concerning similar expert testimony. *See* 34 N.W.3d at 323-25, 327-29. The supreme court concluded that, even if the expert testimony was inadmissible, "[u]nder these facts, there is not a reasonable likelihood that the absence of this testimony would have had a significant effect on the jury's verdict." *Id.* at 329. It explained that "the expert did not provide testimony" about the defendant or "describe [him] in any way." *Id.* The same is true here. Scaia did not mention appellant or discuss the facts of appellant's case.

12

We conclude that the admission of Scaia's testimony about offender behavior did not significantly affect the verdict, and appellant is not entitled to appellate relief. *See Bonnell*, 31 N.W.3d at 549.

**III.    The district court erred by convicting appellant of and sentencing him on two counts of assault against A.**

Appellant and the state agree that the district court erred by convicting him of and sentencing him on count V, fifth-degree assault against A., because count V is an included offense of count IV, second-degree assault with a dangerous weapon against A. We also agree.

Minnesota Statutes section 609.04, subdivision 1(1) (2022), prohibits convicting a defendant of both a crime charged and an "included offense," the latter of which includes "a lesser degree of the same crime." The word "degree" in that subdivision "refer[s] to offenses within an ordinal statutory scheme." *State v. Bradley*, 4 N.W.3d 105, 113 (Minn. 2024).

Second-degree assault and fifth-degree assault are two parts of the ordinal statutory scheme for assault. Accordingly, fifth-degree assault is an "included offense" of second-degree assault because it is a "lesser degree" of assault. Minn. Stat. § 609.04, subd. 1(1). The district court erred by entering a judgment of conviction on count V, fifth-degree assault, because it is an included offense of count IV, second-degree assault. We therefore remand with instructions to vacate the conviction and sentence on count V.[2]

---

[2] Because we conclude that the conviction and sentence for fifth-degree assault must be vacated, we decline to address whether the sentence for fifth-degree assault is permissible under Minnesota Statutes section 609.035 (2022).

**IV.    The district court erred by awarding jail credit to the last sentence imposed.**

Appellant and the state also agree that the district court erred by awarding jail credit to the last sentence imposed rather than the first sentence imposed.  The parties are correct.  When imposing consecutive sentences, "the [district] court must apply . . . jail credit to the first sentence only."  Minn. Sent'g Guidelines § 3.C.2.b (2022).  We therefore remand to the district court with instructions to apply the jail credit to count II, the first count sentenced.

**V.    The arguments in appellant's self-represented supplemental brief do not merit relief.**

Appellant makes several arguments in a self-represented supplemental brief.  We reorder them for ease of reference and address each in turn.

Appellant first argues that the district court abused its discretion by "overlook[ing] direct appearance of drug influenced/intoxicated witness" and "den[ying] the drug testing of [an] intoxicated witness."  Appellant requested at trial that the district court drug test D., providing as a basis for the request her "reputation, her conviction record and things [appellant has] heard in the community."  The district court determined that it did not have a lawful basis to drug test D. at that time, but that it would "keep a watchful eye on that."  We decline to address appellant's argument because he did not support it with legal argument or authority.  *See State v. Munt*, 831 N.W.2d 569, 588 (Minn. 2013) (declining to address appellant's claims because he "fail[ed] to cite any evidence in the record or legal authority to support" them).

Appellant also appears to argue that he received ineffective assistance of counsel. "Generally, an ineffective assistance of counsel claim should be raised in a postconviction petition for relief, rather than on direct appeal." *State v. Gustafson*, 610 N.W.2d 314, 321 (Minn. 2000). We may nonetheless consider an ineffective-assistance-of-counsel claim on direct appeal if the record is adequately developed. *Voorhees v. State*, 627 N.W.2d 642, 649 (Minn. 2001). Here, the record is inadequate for review of appellant's claim. We therefore decline to consider its merits. We preserve appellant's right to pursue an ineffective-assistance-of-counsel claim in a postconviction proceeding subject to the requirements and standards prescribed by law. *See, e.g.*, *State v. Jackson*, 726 N.W.2d 454, 463 (Minn. 2007) (denying ineffective-assistance-of-counsel claim "without prejudice to [appellant's] right to raise them in a postconviction proceeding").

Appellant's next argument states only: "Improper jury; Not a peer present." "The United States and Minnesota Constitutions guarantee a criminal defendant the right to a jury pool that reflects a fair cross-section of the community." *Andersen v. State*, 940 N.W.2d 172, 181 (Minn. 2020). But to establish a violation of that right, an appellant must satisfy the three-prong test established in *State v. Williams*, 525 N.W.2d 538, 542 (Minn. 1994). *See Anderson*, 940 N.W.2d at 181-82. Because appellant does not provide an analysis addressing the three-prong test, his argument is inadequately briefed, so we decline to address it. *See In re Civ. Commitment of Kropp*, 895 N.W.2d 647, 653 (Minn. App. 2017), *rev. denied* (Minn. June 20, 2017).

We decline to address appellant's remaining arguments because they lack support in the record or law. *See Munt*, 831 N.W.2d at 588. Appellant challenges: (1) his lack of

legal representation provided by Band Member Legal Services based on its determination that appellant was not a registered band member; (2) the district court's rejection of the deliberating jury's request to see a map not entered into evidence; (3) prosecutorial misconduct; (4) admission of Scaia's expert testimony; (5) the district court's amendment of its sentencing order; (6) the district court's calculation of jail credit; and (7) the ability of an impeached witness to testify.

In sum, we affirm appellant's convictions of second-degree assault and felony domestic assault but reverse his conviction of fifth-degree assault. We remand to the district court with instructions to (1) vacate the fifth-degree-assault conviction and sentence, leaving the jury's finding of guilt on that count intact and (2) apply appellant's jail credit to count II, the first count sentenced.

**Affirmed in part, reversed in part, and remanded.**